Slip Op. 20-97

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| **BOSUN TOOLS CO., LTD. and CHENGDU HUIFENG NEW MATERIAL TECHNOLOGY CO., LTD.,**<br><br>**Plaintiff and Consolidated Plaintiff,**<br><br>**DANYANG NYCL TOOLS MANUFACTURING CO., LTD. ET AL.,**<br><br>**Plaintiff-Intervenors,**<br><br>v.<br><br>**UNITED STATES,**<br><br>**Defendant,**<br><br>and<br><br>**DIAMOND SAWBLADES MANUFACTURERS' COALITION,**<br><br>**Defendant-Intervenor and Consolidated Defendant-Intervenor.** | **Before: Claire R. Kelly, Judge**<br><br>**Consol. Court No. 18-00102** |

## OPINION AND ORDER

[Sustaining in part and remanding in part Commerce's remand redetermination in the seventh administrative review covering the antidumping duty order covering diamond sawblades and parts thereof from the People's Republic of China.]

Dated: July 14, 2020

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, DC, for plaintiff, Bosun Tools Co., Ltd.

Consol. Court No. 18-00102                                                Page 2

Lizbeth R. Levinson, Ronald M. Wisla, and Brittney R. Powell, Fox Rothschild LLP, of Washington, DC, for consolidated plaintiff Chengdu Huifeng New Material Technology Co., Ltd. and plaintiff-intervenors Danyang NYCL Tools Manufacturing Co., Ltd., Danyang Weiwang Tools Manufacturing Co., Ltd., Hangzhou Deer King Industrial and Trading Co., Ltd., Guilin Tebon Superhard Material Co., Ltd., Jiangsu Youhe Tool Manufacturer Co., Ltd., Quanzhou Zhongzhi Diamond Tool Co., Ltd., Rizhao Hein Saw Co., Ltd., and Zhejiang Wanli Tools Group Co., Ltd.

Joseph H. Hunt, Assistant Attorney General, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. With him on the brief were Franklin E. White, Jr., Assistant Director, Jeanne E. Davidson, Director. Of Counsel on the brief was Paul K. Keith, Attorney, Office of the Chief Counsel for Trade Enforcement and Compliance, of Washington, DC.

Daniel B. Pickard, Maureen E. Thorson, and Stephanie M. Bell, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor and consolidated defendant-intervenor, Diamond Sawblades Manufacturers' Coalition.

Kelly, Judge:    Before the court is the U.S. Department of Commerce's ("Department" or "Commerce") remand redetermination filed pursuant to the court's order in Bosun Tools Co. v. United States, 43 CIT __, 405 F. Supp. 3d 1359 (2019) ("Bosun I"). See also Redetermination Pursuant to Court Remand Order in Bosun I, Mar. 10, 2020, ECF No. 79 ("Remand Results"). In Bosun I, the court sustained in part and remanded in part Commerce's final determination in the seventh administrative review for the antidumping duty ("ADD") order covering diamond sawblades and parts thereof ("DSBs") from the People's Republic of China ("PRC"). [DSBs] From the [PRC], 83 Fed. Reg. 17,527 (Dep't Commerce Apr. 20, 2018) (final results of [ADD] admin. review; 2015–2016) ("Final Results"), and accompanying Issues & Decision Memo. Admin. Review [ADD] Order on [DSBs] from the [PRC], A-570-900, (Apr. 16, 2018), ECF No. 24-5 ("Final Decision Memo"); [DBSs] From the

[PRC] and the Republic of Korea, 74 Fed. Reg. 57,145 (Dep't Commerce Nov. 4, 2009) ([ADD] orders).

The court directed Commerce to place the business confidential and public versions of Chengdu Huifeng New Material Technology Co., Ltd.'s ("Chengdu") second supplemental response on the record and consider it for purposes of calculating Chengdu's dumping margin, as well as recalculate any margins affected by a change to Chengdu's margin. See Bosun I, 43 CIT at __, 405 F. Supp. 3d at 1366–67. On remand, Commerce, under respectful protest,[1] placed Chengdu's second supplemental response on the record and considered that response, along with Chengdu's responses to two additional supplemental questionnaires issued during the remand proceeding, and calculated an individual rate for Chengdu as well as recalculated the separate rate respondents' rates. See Remand Results at 1–2.

Plaintiff Bosun Tools Co., Ltd. ("Bosun") as well as Plaintiff-Intervenors Danyang NYCL Tools Manufacturing Co., Ltd., Danyang Weiwang Tools Manufacturing Co., Ltd., Guilin Tebon Superhard Material Co., Ltd., Hangzhou Deer King Industrial and Trading Co., Ltd., Jiangsu Youhe Tool Manufacturer Co., Ltd., Quanzhou Zhongzhi Diamond Tool Co., Ltd., Rizhao Hein Saw Co., Ltd. and Zhejiang Wanli Tools Group Co., Ltd. (collectively, "separate rate respondents") challenge as unsupported by substantial evidence and not in accordance with law Commerce's

---

[1] By adopting a position forced upon it by the Court "under protest," Commerce preserves its right to appeal. See Viraj Grp., Ltd. v. United States, 343 F. 3d 1371, 1376 (Fed. Cir. 2003).

calculation of a separate rate respondents' rate.  Pl. [Bosun's] Cmts. Opp'n Remand Results at 1, Apr. 10, 2020, ECF No. 82 ("Pl.'s Br."); Pl.-Intervenors' Cmts. [Remand Results] at 1–2, Apr. 10, 2020, ECF No. 84 ("Pl.-Intervenors' Br.").  Defendant-Intervenor Diamond Sawblades Manufacturers' Coalition ("DSMC") challenges as unsupported by substantial evidence and contrary to law Commerce's reversal of its original determination to apply adverse facts available with an adverse inference to Chengdu.  See [DSMC] Comments on [Remand Results] at 3–4, Apr. 10, 2020, ECF No. 81 ("Def-Intervenor's Br.").  However, DSMC argues that Commerce did not err in calculating the separate rate respondents' rate.  [DSMC] Reply Cmts. [Remand Results] at 3–11, May 21, 2020, ECF No. 88 ("Def.-Intervenor's Reply Br.").  Consolidated Plaintiff Chengdu and Defendant request the court to uphold the Remand Results in their entirety.  Consol. Pl.'s Cmts. [Remand Results], Apr. 10, 2020, ECF No. 83 ("Consol. Pl.'s Br."); Def.'s Resp. Cmts. Remand Results, May 21, 2020, ECF No. 87 ("Def.'s Br.").  For the reasons that follow, the court sustains Commerce's determination of Chengdu's rate and remands for further explanation or consideration the calculation of the rate applicable to Bosun and the separate rate respondents.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its previous opinion ordering remand to Commerce, and now recounts those relevant to the court's review of the Remand Results.  See Bosun I, 43 CIT at __, 405 F. Supp. 3d

at 1363–64.  Relevant here, in the seventh administrative review of the ADD order

covering DSBs from the PRC,[2] Commerce selected Chengdu and Jiangsu Fengtai

Single Entity ("Fengtai") as mandatory respondents.[3]  See Selection of Respondents

for Individual Examination at 8, PD 106, bar code 3566489-01 (Apr. 26, 2017).[4]

Commerce found Chengdu qualified for a separate rate.[5]  In addition, Commerce

---

[2] The seventh administrative review covered subject merchandise entered during the period November 1, 2015 through October 31, 2016.  Initiation of Antidumping & Countervailing Duty Admin. Reviews, 82 Fed. Reg. 4,294, 4,296 (Dep't Commerce Jan. 13, 2017).

[3] No party challenged Commerce's calculation of Fengtai's rate, and Fengtai is not a party to this consolidated action.

[4] On June 13, 2018, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination.  Defendant later filed a corrected index to the confidential record.  The relevant indices are located on the docket at ECF Nos. 24-1 and 29.  Subsequently, on March 24, 2020, Commerce filed on the docket the indices for the remand administrative record at ECF Nos. 80-1–2.  All references to administrative record documents in this opinion are to the numbers Commerce assigned to the documents in the relevant indices.

[5] In antidumping proceedings, Commerce presumes that the export activities of all companies operating in a non-market economy ("NME") country, like the PRC, are subject to government control.  [DSBs] From the [PRC]: Decision Memo. for Prelim. Results of [ADD] Admin. Review; 2015–2016 at 4, A-570-900, PD 255, bar code 3646590-01 (Nov. 30, 2017).  The presumption is rebuttable, and companies seeking to rebut it file a separate rate application through which they must demonstrate that their export activities are de facto and de jure free of the NME-country's control.  Id. If a company successfully rebuts the presumption, it is assigned its own separate rate. Id.

Congress does not prescribe a method for calculating a separate rate.  Congress does, however, in 19 U.S.C. § 1673d(c)(5) prescribe a method for calculating an all-others rate, a rate assigned to non-mandatory respondent companies from a market economy country.  Commerce has, by practice, adopted the methodology in 19 U.S.C. § 1673d(c)(5) to calculate a separate rate.  See Albemarle Corp. & Subsidiaries v.

(footnote continued)

rejected as untimely the public and business proprietary versions of Chengdu's second supplemental response. See Commerce's Rejection of Chengdu's Second Suppl. Resp. at 1–2, PD 235, bar code 3625400-01 (Oct. 3, 2017). Commerce also denied Chengdu's request for reconsideration. See generally Chengdu's Resp. & Req. for Reconsideration of Commerce's Rejection Memo., PD 236, bar code 3627194-01 (Oct. 6, 2017); Commerce's Denial of Chengdu's Reconsideration Req., PD 246, bar code 3635994-01 (Nov. 1, 2017). Given that Commerce found that Chengdu missed the filing deadline[6] and did not act to the best of its ability to supply necessary information, Commerce determined its rate on the basis of total AFA,[7] selecting the

United States, 821 F.3d 1345, 1351–53 (Fed. Cir. 2016); see also 19 U.S.C. § 1673d(c)(5). Section 1673d(c)(5) states that the all-others rate shall be the weighted average of the individually investigated exporter's and producer's dumping margins, excluding any margins that are de minimis, zero, or determined entirely by adverse facts available. As a result, the rate assigned to the successful separate rate respondents depends on the rate(s) calculated for the mandatory respondent(s).

[6] Chengdu successfully uploaded the unredacted version of its second supplemental submission onto the Enforcement and Countervailing Duty Centralized Electronic Service System ("ACCESS") but was unable to upload the complete redacted version prior to the filing deadline. See Bosun I, 43 CIT at __, 405 F. Supp. 3d at 1365.

[7] Parties and Commerce sometimes use the shorthand "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination. However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available." See 19 U.S.C. § 1677e(a)–(b). The phrase "total adverse inferences" or "total AFA" encompasses a series of steps that Commerce takes to reach the conclusion that all of a party's reported information is unreliable or unusable and that as a result of a party's failure to cooperate to the best of its ability, it must use an adverse inference in selecting among the facts otherwise available.

PRC-wide entity rate of 82.05 percent as Chengdu's total AFA rate.   See Final Results, 83 Fed. Reg. at 17,528; see also [DSBs] From the [PRC], 82 Fed. Reg. 57,585, 57,586 (Dep't Commerce Dec. 6, 2017) (prelim. results of [ADD] admin. review; 2015–2016) ("Prelim. Results"), and accompanying Decision Memo. for [Prelim. Results] at 10–13, A-570-900, PD 255, bar code 3646590-01 (Nov. 30, 2017) ("Prelim. Decision Memo."). Likewise, Commerce applied total AFA to determine Fengtai's rate, because Commerce found Fengtai missed filing deadlines and failed to cooperate to the best of its ability. See Final Decision Memo. at 7–12, 16–19, 21; see also Prelim. Decision Memo. at 13. Commerce assigned the separate rate respondents the same AFA rate.[8]  See Final Results, 83 Fed. Reg. at 17,528. Bosun and Chengdu initiated separate actions, which were later consolidated, challenging Commerce's rejection of Chengdu's second supplemental response and the application of total AFA to select the rate assigned to Chengdu and the separate rate respondents in the Final Results. See [Bosun's] Summons, May 4, 2018, ECF No. 1; [Bosun's] Compl., May 4, 2018, ECF No. 6; Order at 2, July 27, 2018, ECF No. 28.[9]

In Bosun I, the court held Commerce's rejection of Chengdu's second supplemental response was an abuse of discretion and directed Commerce, on remand, to place the submission on the record and consider it for purposes of

---

[8] Commerce found that Bosun and Plaintiff-Intervenors were eligible for a separate rate. See Final Decision Memo at 21 & n.89; Prelim. Decision Memo at 6–8.

[9] On May 24, 2018, the court granted Plaintiff-Intervenors' motion to intervene as a matter of right. Order, May 24, 2018, ECF No. 20.

calculating Chengdu's rate and to recalculate any rates affected by a change to Chengdu's rate. See Bosun I, 43 CIT at __, 405 F. Supp. 3d at 1366–67.[10] The court did not reach whether Commerce's use of total AFA to select the margin assigned to Chengdu and the separate rate respondents was contrary to law. Id., 43 CIT at __, 405 F. Supp. 3d at 1367.

On remand, Commerce placed Chengdu's second supplemental response on the record under respectful protest, because Commerce disagrees with the court's direction in Bosun I. See Remand Results at 1, 6. Commerce considered Chengdu's second supplemental response, as well as its responses to two additional supplemental questionnaires that Commerce issued during the remand proceeding, in determining Chengdu's rate. Id. at 1–2, 4. Using that information, Commerce calculated an individual antidumping rate of 0.00 percent for Chengdu. Id. at 4.

---

[10] Specifically, the court held that Commerce abused its discretion in rejecting and removing from the record Chengdu's second supplemental response, when Chengdu successfully uploaded the unredacted version, but not the redacted version, of that response onto ACCESS before the filing deadline expired and timely served interested parties a copy of the unredacted submission. See Bosun I, 43 CIT at __, 405 F. Supp. 3d at 1364–67. Chengdu had attempted to upload the redacted version prior to the expiry of the filing deadline but was only successful in uploading part and Commerce soon after notified Chengdu to re-file the redacted version, which Chengdu successfully did. Id., 43 CIT at __, 405 F. Supp. 3d at 1365. Given that Commerce and all interested parties had timely received copies of the full, unredacted version of the submission, the court could not conclude that Chengdu's actions infringed or delayed Commerce's review of the information in the submission. Id., 43 CIT at __, 405 F. Supp. 3d at 1366. Further, the court noted that Commerce's rejection of the submission would likely undermine the accurate calculation of dumping margins. Id., 43 CIT at __, 405 F. Supp. 3d at 1366. Therefore, the court ordered Commerce to place Chengdu's submission on the record. Id., 43 CIT at __, 405 F. Supp. 3d at 1366–67.

Commerce also assigned the separate rate respondents the average of Chengdu's 0.00 percent rate and Fengtai's AFA 82.05 percent rate, i.e., an all others rate of 41.025 percent. Id. at 7–8, 14–18.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 19 U.S.C. § 1516a(a)(2)(B)(iii) and 28 U.S.C. § 1581(c) (2012), which grant the Court authority to review actions contesting the final determination in an administrative review of an antidumping duty order. This Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014) (quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

## I.    Commerce's Calculation of Chengdu's Rate

DSMC argues that Commerce's decision on remand not to apply adverse facts available with an adverse inference to Chengdu is unsupported by substantial evidence and contrary to law, because Commerce had appropriately determined Chengdu's margin on the basis of total AFA in the Final Results. See Def.-Intervenor's Br. at 3–4. Although DSMC disagrees with the remand order in Bosun

I, it does not argue that Commerce failed to comply with the court's order or otherwise take issue with the <u>Remand Results</u>. <u>See generally</u> <u>id.</u> Defendant requests the court to sustain Commerce's calculation of Chengdu's rate because the <u>Remand Results</u> comply with the court's remand order. <u>See</u> Def.'s Br. at 5–6. Chengdu also requests the court to affirm the remand results. <u>See</u> Consol. Pl.'s Br. at 1. Because Commerce placed Chengdu's second supplemental response on the record and considered that response in its determination of Chengdu's rate as directed in <u>Bosun I</u>, the court sustains Commerce's determination of Chengdu's rate. <u>See</u> <u>Remand Results</u> at 1–4, 6.

## II.     Commerce's Adjustment of Separate Rate Respondents' Rate

Bosun and separate rate respondents contend that Commerce erred in assigning the separate rate companies an all others rate of the average of Chengdu's 0.00 percent rate and Fengtai's 82.05 percent rate. <u>See</u> Pl.'s Br. at 1–2; Pl.-Intervenors' Br. at 1–2. Further, they argue that Commerce's application of the "expected method" under the statute, 19 U.S.C. § 1673d(c)(5), is unsupported by substantial evidence and not in accordance with law. <u>See</u> Pl.'s Br. at 1–2; Pl.-Intervenors' Br. at 1–2. Defendant and DSMC counter that Commerce reasonably relied upon an "expected method" and that its chosen methodology, as applied, is reasonable and in accordance with law. <u>See</u> Def.'s Br. at 6–11; Def.-Intervenor's Reply Br. at 3–10. Likewise, Chengdu requests the court to affirm Commerce's calculation of the separate rate companies' margin. <u>See</u> Consol. Pl.'s Br. at 1. For

the reasons that follow, Commerce's calculation of the 41.025 percent rate applicable

to the separate rate respondents is not supported by substantial evidence.

Commerce normally calculates the all-others rate—or the rate applicable to

non-investigated exporters and producers—as the "weighted average of the estimated

weighted average dumping margins established for exporters and producers

individually examined, excluding any zero and de minimis margins" and margins

determined entirely on the basis of facts otherwise available.[11]    19 U.S.C.

§ 1673d(c)(5)(A).[12]  However, where all margins for individually examined exporters

and producers are zero, de minimis, or based entirely on facts otherwise available,

Commerce "may use any reasonable method to establish the estimated all others rate

. . . , including averaging the estimated weighted average dumping margins

determined for the exporters and producers individually investigated."    Id. at

---

[11] Commerce is authorized to impose antidumping duties when merchandise is sold at less than fair value in the United States.  19 U.S.C. § 1673.  Antidumping duties are equal to the dumping margin, or the amount by which "normal value"—or, the price of merchandise in the exporting country—exceeds the export price—or the price of merchandise in the United States.  Id. at §§ 1673e(a)(1), 1677b(a)(1), 1677a(a).  If the exporting country is designated a nonmarket economy ("NME"), like the PRC, "sales of merchandise in [that NME] country do not reflect the fair value of merchandise."  19 U.S.C. § 1677(18)(A).  Therefore, Commerce determines normal value based on an NME producer's factors of production, used to produce the subject merchandise, in a market economy country or countries.  See id. at § 1677b(c); see also 19 C.F.R. § 351.408.  Commerce assumes that all producers are part of the government-entity and, in its preliminary and final determinations, calculates one country-wide margin, unless an investigated respondent demonstrates it qualifies for a separate rate.  See 19 C.F.R. § 351.408.

[12] The Court of Appeals for the Federal Circuit has clarified that the methods under 19 U.S.C. § 1673d apply to administrative reviews as well as investigations.  See Albemarle Corp. v. United States, 821 F.3d 1345, 1352–53 (Fed. Cir. 2016).

§ 1673d(c)(5)(B). The Statement of Administrative Action elaborates that the "expected method[,]" in this scenario, is "to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994 U.S.C.C.A.N. 4040, 4201.[13] If the "expected method" is "not feasible" or the method "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers," Commerce may, instead, "use other reasonable methods." Id. Commerce's determination must be supported by substantial evidence. See Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1353 (Fed. Cir. 2016) (explaining that "Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different" to depart from the "expected method").

For example, in Albemarle, the Court of Appeals evaluated Commerce's decision to set, as the rate applicable to three qualifying separate rate companies, the margins previously assigned to those same three separate rate companies from a prior administrative review (i.e., use non-contemporaneous data), rather than follow the "expected method" of averaging the de minimis margins assigned to the

---

[13] The Statement of Administrative Action is "recognized by Congress as an authoritative expression concerning the interpretation and application of the Tariff Act under 19 U.S.C. § 3512(d)[.]" Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1373 (Fed. Cir. 2013).

individually examined respondents.  See id. at 1349.  In evaluating Commerce's determination, the Court of Appeals noted that the statute's "expected method" accords with the statutory framework, namely that the statute contemplates that, by individually investigating a limited number of exporters that account for a majority of the market, Commerce may approximate the margins of all known exporters.  Id. at 1353.[14]  Thus, the Court of Appeals explained that Commerce must find, based on substantial evidence, that there is a reasonable basis to conclude that the non-individually examined respondents' dumping is different in order to depart from the "expected method."  Id.  For two of the separate rate companies, the Court of Appeals held that Commerce's decision to deviate from the expected method and carry forward their previously assigned rates was not reasonable, when neither company had been individually examined in previous reviews and when Commerce lacked data specific to the two companies.  Id. at 1355.[15]  As a result, the Court of Appeals held that Commerce had no basis to conclude that the separate rate companies' potential dumping was different from the individually examined respondents' dumping and

---

[14] The Court of Appeals elaborated that "[t]he representativeness of the investigated exporters is the essential characteristic that justifies an 'all others' rate based on a weighted average for such respondents."  Albemarle, 821 F.3d at 1353 (citing Nat'l Knitwear & Sportswear Ass'n v. United States, 15 CIT 548, 559, 779 F. Supp. 1364, 1373–74 (1991)) (internal quotes omitted).

[15] The Court of Appeals noted that in the immediately preceding administrative review, Commerce assumed that the individually examined respondents were reasonably representative of the two separate rate companies and, as a result, calculated the separate rate by averaging the margins of the individually examined respondents (i.e., applied the "expected method").  Albemarle, 821 F.3d at 1355.

apply "any other reasonable method." Id. However, for the third separate rate company, the Court of Appeals found that Commerce had information specific to that company, because it had been individually examined in the preceding administrative review. Id. Specifically, the court noted, the margin assigned to that company in the preceding review was far higher than what would be the average of the individually examined respondents in the instant review, indicating that following the "expected method" might not reflect that separate rate company's potential dumping margin. Id. Therefore, the court held that Commerce was entitled to resort to "other reasonable methods" under the statute. Id. at 1355–56.[16]

Further, "accuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters," Albemarle, 821 F.3d at 1354

---

[16] However, the Court of Appeals ultimately held that Commerce's decision to apply a previous, non-contemporaneous margin did not constitute an "other reasonable method[]" given the facts at hand and remanded Commerce's determination. Albemarle, 821 F.3d at 1356–59. Specifically, the Court of Appeals faulted Commerce for assuming that the underlying facts or the margins remained the same from the prior period of review. Id. at 1356–57. Even though, as the court acknowledged, there may be "at least two circumstances" in which it may be appropriate to apply a non-contemporaneous rate—where the overall market and dumping margins have not changed or where, based on a lack of cooperation that warrants the application of AFA, Commerce may assume a respondent's dumping behavior has not changed—neither circumstance applied to the cooperating separate rate company. Id. at 1357–58. In addition, the court disagreed with the defendant that a history of dumping in itself demonstrates that the dumping continued at the same rate, even if that history of dumping from prior administrative reviews "is relevant and may inform Commerce's methodology[.]" Id. at 1358. The court also found it unreasonable that Commerce carried over the separate rate company's' prior rate, when it could have collected additional data but declined to do so, and when it had partial data already on the record specific to that company. Id. at 1358–59.

(citing Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1379 (Fed. Cir. 2013)), contrary to Commerce's suggestion, here, that such concerns are no longer valid.  See Remand Results at 16.  Specifically, Commerce contends that accuracy and fairness concerns stem from a statutorily superseded requirement laid out in Gallant Ocean that Commerce consider "commercial reality."  See Remand Results at 16 (citing Gallant Ocean (Thailand) Co. v. United States, 602 F.3d 1319, 1325 (Fed. Cir. 2010)).  The statutory provision at issue provides that, when Commerce makes an adverse inference in selecting among facts otherwise available, Commerce "is not required, for purposes of subsection (c) or for any other purpose . . . to demonstrate that the countervailable subsidy rate or dumping margin . . . reflects an alleged commercial reality of the interested party."  See 19 U.S.C. § 1677e(d)(3). It does not stand to reason that  the statutory directive not to consider "commercial reality" in the AFA context obviated the fairness and accuracy concerns identified by Bestpak when applying a separate statutory provision to cooperative respondents. See Bestpak, 716 F.3d at 1379–80; see also Albemarle, 821 F.3d at 1354 (citing to Gallant Ocean for the proposition that "accuracy and fairness must be Commerce's primary objectives in calculating a separate rate for cooperating exporters").

Here, Commerce's application of the "expected method" of weight-averaging the zero and AFA margins is not reasonable, because Commerce failed to consider evidence indicating that the 41.025 rate is not reasonably reflective of the separate rate respondents' dumping. Albemarle, 821 F.3d at 1355–57. Specifically, Commerce

fails to address evidence which detracts from its determination to use the expected

method. Albemarle establishes that Commerce will use the expected method unless

it determines that the expected method will result in dumping margins not

reasonably reflective of a separate rate respondent's potential dumping margin and

supports that determination with substantial evidence. See Albemarle, 821 F.3d at

1353 ("Commerce must find based on substantial evidence that there is a reasonable

basis for concluding that the separate rate respondents' dumping is different."); see

also id. at 1355–57. Bosun put forth evidence that the expected method would result

in an unreasonable rate. See Pl.'s Br. at 6–7 (explaining that "there is a history of

low calculated dumping margins," including margins assigned to Bosun following

individual examination). The separate rate companies and Bosun did not, as

Commerce finds, "fail to identify any record evidence suggesting that the separate

rate does not reasonably reflect their potential dumping margins." Remand Results

at 15. Rather, Commerce simply declines to address that evidence because it was

non-contemporaneous. Id. at 8 n.20, 14–15. Commerce errs by summarily rejecting

that evidence.[17] Id. at 15; see also Solianus Inc. v. United States, 43 CIT __, __, 391

---

[17] Commerce misreads Albemarle. Commerce invokes Albemarle to reject non-contemporaneous data as a basis to deviate from the expected method. See Second Remand Results at 14–15; see also Def.'s Br. at 9–10 (defending Commerce's analysis based on Albemarle). However, in Albemarle the Court of Appeals endorsed Commerce's reliance upon non-contemporaneous data for it to depart from the expected method in determining the "all others" rate. Id., 821 F.3d at 1356. Contrary

(footnote continued)

F. Supp. 3d 1331, 1339 (sustaining Commerce's adherence to the "expected method" when there was no evidence why the resultant margin failed, as the plaintiffs alleged, to reflect their economic reality).    On remand, and consistent with <u>Albemarle</u>, Commerce must either reconsider its determination or explain why following the "expected method" is reasonable in light of evidence of any margins assigned to the separate respondents and Bosun, when individually investigated in prior reviews.[18]

---

to Commerce's approach here, the <u>Albemarle</u> court instructs Commerce to consider any evidence on the record—in that case, the presence or absence of historical data—to determine whether to apply the expected method. <u>Compare</u> <u>Remand Results</u> at 14 <u>with</u> <u>Albemarle</u>, 821 F.3d at 1355–56. The contemporaneity of the data is then considered when establishing the reasonableness of a rate established by an alternative method.    <u>See</u> <u>Albemarle</u>, 821 F.3d at 1356–59.

[18] On remand, Commerce, in determining whether to apply the "expected method," should consider any margins determined by individual examination of Bosun and any of the separate rate respondents in prior administrative reviews. <u>Cf.</u> <u>Albemarle</u>, 821 F.3d at 1355–57. Should Commerce, on remand, determine that following the "expected method" does not reflect Bosun's or one or more of the separate rate respondents' potential dumping margins, Commerce must provide a reasoned explanation for its selection of an "other reasonable methodology[]" in light of <u>Albemarle</u>. <u>See</u> <u>id.</u>, 821 F.3d at 1356–59; <u>see also</u> <u>Yangzhou Bestpak & Crafts Co. v.</u> <u>United States</u>, 716 F.3d 1370, 1378–81 (Fed. Cir. 2013). Commerce may consider the extent to which it has information on the record regarding a separate rate respondent and whether it would be appropriate to reopen the record to collect additional information. <u>Albemarle</u>, 821 F.3d at 1358–59 (citing <u>Amanda Foods (Vietnam) Ltd.</u> <u>v. United States</u>, 35 CIT at 415–17, 774 F. Supp. 2d 1286, 1289–90 (2011) ("<u>Amanda</u> <u>Foods</u>") (noting, in <u>Amanda Foods</u>, that Commerce reopened the administrative record to collect additional information from separate rate respondents when all individually assigned respondents were assigned de minimis margins). Further, to the extent that Bosun and the separate rate respondents suggest that a zero rate would be reasonably reflective of their potential dumping margins, that is a determination for Commerce to make after considering record evidence, should it

(footnote continued)

## CONCLUSION

In accordance with the foregoing, it is

**ORDERED** that Commerce's calculation of Chengdu's rate is sustained; and it is further

**ORDERED** that Commerce's determination of the rate applicable to Bosun and the separate rate respondents is remanded for further explanation or consideration consistent with this opinion; and it is further

**ORDERED** that Commerce shall file its remand redetermination with the court within 90 days of this date; and it is further

**ORDERED** that the parties shall have 30 days thereafter to file comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 30 days to file their replies to comments on the remand redetermination; and it is further

**ORDERED** that the parties shall have 14 days thereafter to file the Joint Appendix; and it is further

---

decide to depart from the "expected method." See Pl.'s Br. at 12; Pl.-Intervenors' Br. at 1–2. Nonetheless, Commerce should heed the Albemarle court's words of caution regarding carrying forward non-contemporaneous margins and AFA margins, when, as is the case here, the non-individually examined respondents cooperated. See id., 821 F.3d at 1357–58.

Consol. Court No. 18-00102                                               Page 19

     **ORDERED** that Commerce shall file the administrative record within 14 days

of the date of filing of its remand redetermination.


                                         /s/ Claire R. Kelly
                                        Claire R. Kelly, Judge


Dated:       July 14, 2020
               New York, New York