Slip Op. 21-23

# UNITED STATES COURT OF INTERNATIONAL TRADE

| | |
|---|---|
| BOSUN TOOLS CO., LTD. and CHENGDU HUIFENG NEW MATERIAL TECHNOLOGY CO., LTD., <br><br>    Plaintiff and Consolidated Plaintiff, <br><br>and <br><br>DANYANG NYCL TOOLS MANUFACTURING CO., LTD. ET AL., <br><br>    Plaintiff-Intervenors, <br><br>v. <br><br>UNITED STATES, <br><br>    Defendant, <br><br>and <br><br>DIAMOND SAWBLADES MANUFACTURERS' COALITION, <br><br>    Defendant-Intervenor and Consolidated Defendant-Intervenor. | Before: Claire R. Kelly, Judge <br><br> Consol. Court No. 18-00102 |

## OPINION

[Sustaining Commerce's second remand redetermination in the seventh administrative review for the antidumping duty order covering diamond sawblades and parts thereof from the People's Republic of China.]

Dated: February 24, 2021

Gregory S. Menegaz, J. Kevin Horgan, and Alexandra H. Salzman, deKieffer & Horgan, PLLC, of Washington, DC, for plaintiff, Bosun Tools Co., Ltd.

Lizbeth R. Levinson, Ronald M. Wisla, and Brittney R. Powell, Fox Rothschild LLP, of Washington, DC, for consolidated plaintiff Chengdu Huifeng New Material Technology Co., Ltd. and plaintiff-intervenors Danyang NYCL Tools Manufacturing Co., Ltd., Danyang Weiwang Tools Manufacturing Co., Ltd., Guilin Tebon Superhard Material Co., Ltd., Hangzhou Deer King Industrial and Trading Co., Ltd., Jiangsu Youhe Tool Manufacturer Co., Ltd., Quanzhou Zhongzhi Diamond Tool Co., Ltd., Rizhao Hein Saw Co., Ltd., and Zhejiang Wanli Tools Group Co., Ltd.

John J. Todor, Senior Trial Counsel, Commercial Litigation Branch, Civil Division, U.S. Department of Justice, of Washington, DC, for defendant. Also on the brief was Franklin E. White, Jr., Assistant Director, Jeanne E. Davidson, Director, and Jeffrey Bossert Clark, Acting Assistant Attorney General. Of Counsel was Paul Keith, Attorney, Office of the Chief Counsel for Trade Enforcement & Compliance, of Washington, DC.

Daniel B. Pickard, Maureen E. Thorson, Stephanie M. Bell, and Cynthia C. Galvez, Wiley Rein, LLP, of Washington, DC, for defendant-intervenor and consolidated defendant-intervenor, Diamond Sawblades Manufacturers' Coalition.

Kelly, Judge: Before the court is the U.S. Department of Commerce's ("Commerce") second remand redetermination filed pursuant to the court's order in Bosun Tools Co. v. United States, 44 CIT __, __, 463 F. Supp. 3d 1308, 1319 (2020) ("Bosun II"). See also Final Second Remand Redetermination, Oct. 13, 2020, ECF No. 94-1 ("Second Remand Results"). In Bosun II, the court sustained in part and remanded in part Commerce's remand redetermination in the seventh administrative review for the antidumping duty ("ADD") order covering diamond sawblades and parts thereof ("DSBs") from the People's Republic of China ("PRC"). See Bosun II, 44 CIT at __, 463 F. Supp. 3d at 1319; Final Results of Redetermination Pursuant to Ct. Remand, Mar. 10, 2020, ECF No. 79-1 ("Remand Results"). The court remanded for

further consideration, or explanation, Commerce's determination of the rate applicable to Bosun Tools Co., Ltd. ("Bosun") and the separate rate respondents. See Bosun II, 44 CIT at __, 463 F. Supp. 3d at 1319. Commerce further explains that its decision to use the expected method, i.e., to average the rates of the examined respondents, to calculate the separate rate for separate rate respondents, including Bosun, is reasonable in light of record evidence of recent past calculated rates. See Second Remand Results at 8–9, 15. Bosun contends that the calculated rate assigned to Jiangsu Fengtai Single Entity ("Fengtai") in a prior review, that Commerce compares to the separate rate here, is an outlier, and that Commerce otherwise did not comply with the court's remand order. See Pl. Bosun Tools Co., Ltd.'s Cmts. Opp. Second Remand Results at 1–2, Nov. 12, 2020, ECF No. 97 ("Bosun's Br."). For the following reasons, the court sustains Commerce's determination.

## BACKGROUND

The court presumes familiarity with the facts of this case as set out in its previous opinions ordering remand and now recounts those relevant to the court's review of the Second Remand Results. See Bosun Tools Co. v. United States, 43 CIT __, __, 405 F. Supp. 3d 1359, 1363–64 (2019) ("Bosun I"); Bosun II, 44 CIT at __, 463 F. Supp. 3d at 1319. Relevant here, Commerce selected Chengdu Huifeng New Material Technology Co., Ltd. ("Chengdu") and Fengtai as mandatory respondents.[1]

---

[1] Commerce is authorized to impose ADDs when merchandise is sold at less than fair

(footnote continued)

See Selection of Respondents for Individual Examination at 8, PD 106, bar code 3566489-01, ECF No. 24-1 (Apr. 26, 2017).[2] Although both companies sought separate rate certification,[3] Commerce found both companies uncooperative, finding

---

value in the United States. See 19 U.S.C. § 1673 (2012). ADDs are equal to the dumping margin, or the amount by which "normal value"—or, the price of merchandise in the exporting country—exceeds the export price—or the price of merchandise in the United States. Id. at §§ 1673e(a)(1), 1677b(a)(1), 1677a(a). If the exporting country is designated a nonmarket economy ("NME"), like the PRC, "sales of merchandise in [that NME] country do not reflect the fair value of merchandise." See id. at § 1677(18)(A). Therefore, Commerce determines normal value based on an NME producer's factors of production, used to produce the subject merchandise, in a market economy country or countries. See id. at § 1677b(c); see also 19 C.F.R. § 351.408 (2012). In proceedings involving a nonmarket economy, Commerce presumes exporters and producers are under foreign government control with respect to export activities, and will assign a single "country-wide" rate unless a respondent demonstrates it qualifies for a separate rate. See Yangzhou Bestpak Gifts & Crafts Co. v. United States, 716 F.3d 1370, 1373 (Fed. Cir. 2013) ("Yangzhou") (citing Sigma Corp. v. United States, 117 F.3d 1401, 1405 (Fed. Cir. 1997)); see also 19 C.F.R. § 351.107(d).

[2] On June 13, 2018, Defendant submitted indices to the public and confidential administrative records underlying Commerce's final determination. Defendant later filed a corrected index to the confidential record. The relevant indices are located on the docket at ECF Nos. 24-1 and 29-1, respectively. Subsequently, on March 24, 2020, Commerce filed on the docket the indices for the remand administrative record at ECF Nos. 80-1–2. All references to administrative record documents in this opinion are to the numbers Commerce assigned to the documents in the relevant indices.

[3] A party may attempt to rebut the presumption of government control by filing a separate rate application through which it must demonstrate that their activities are de facto and de jure free of the NME-country's control. See [DSBs] From the [PRC]: Decision Memo for Prelim. Results of [ADD] Admin. Rev.; 2015–2016 at 4, A-570-900, PD 255, bar code 3646590-01, ECF No. 24-1 (Nov. 30, 2017). If a company successfully rebuts the presumption, it is assigned its own separate rate. See id. Congress does not prescribe a method for calculating a separate rate. Congress does, however, in 19 U.S.C. § 1673d(c)(5) prescribe a method for calculating an all-others rate, a rate assigned to non-mandatory respondent companies from a market

(footnote continued)

they withheld necessary information from Commerce, and assigned each a rate based on total facts available with an adverse inference ("AFA").[4] Specifically with respect to Chengdu, Commerce rejected as untimely the public and business proprietary versions of Chengdu's second supplemental response.[5] See Commerce's Rejection of Chengdu's Second Suppl. Resp. at 1–2, PD 235, bar code 3625400-01, ECF No. 24-1 (Oct. 3, 2017). Commerce assigned separate rate respondents, a rate of 82.05 percent, invoking the expected method of averaging the rates assigned to the individually examined mandatory respondents. See [DSBs] From the [PRC], 83 Fed. Reg. 17,527, 17,528 (Dep't Commerce Apr. 20, 2018) (final results of [ADD] admin. rev.; 2015–2016) ("Final Results") and accompanying Issues & Decision Memo Admin. Rev.

---

economy country. Commerce has, by practice, adopted the methodology in 19 U.S.C. § 1673d(c)(5) to calculate a separate rate. See Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1351–53 (Fed. Cir. 2016) ("Albemarle"); see also 19 U.S.C. § 1673d(c)(5). Section 1673d(c)(5) states that the all-others rate shall be the weighted average of the individually investigated exporter's and producer's dumping margins, excluding any margins that are de minimis, zero, or determined entirely by adverse facts available..

[4] Parties and Commerce sometimes use the shorthand "adverse facts available" or "AFA" to refer to Commerce's reliance on facts otherwise available with an adverse inference to reach a final determination. However, AFA encompasses a two-part inquiry pursuant to which Commerce must first identify why it needs to rely on facts otherwise available, and second, explain how a party failed to cooperate to the best of its ability as to warrant the use of an adverse inference when "selecting among the facts otherwise available." 19 U.S.C. § 1677e(a)–(b). The phrase "total adverse inferences" or "total AFA" encompasses a series of steps that Commerce takes to reach the conclusion that all of a party's reported information is unreliable or unusable and that as a result of a party's failure to cooperate to the best of its ability, it must use an adverse inference in selecting among the facts otherwise available.

[5] No party challenged Commerce's calculation of Fengtai's rate, and Fengtai is not a party to this consolidated action.

[ADD] Order on [DSBs] from the [PRC] at 24–27, A-570-900, ECF No. 24-5 (Apr. 16, 2018) ("Final Decision Memo"); see also [DSBs] From the [PRC], 82 Fed. Reg. 57,585, 57,586 (Dep't Commerce Dec. 6, 2017) (prelim. results of [ADD] admin. rev.; 2015–2016) ("Prelim. Results"), and accompanying Decision Memo. for [Prelim. Results] at 10–13, A-570-900, PD 255, bar code 3646590-01, ECF No. 24-1 (Nov. 30, 2017).

In Bosun I, the court held Commerce abused its discretion when it rejected Chengdu's second supplemental response and directed Commerce, on remand, to place the submission on the record and consider it for purposes of calculating Chengdu's rate and to recalculate any rates affected by a change to Chengdu's rate. See Bosun I, 43 CIT at __, 405 F. Supp. 3d at 1366–67. On remand, Commerce placed Chengdu's second supplemental response on the record under respectful protest. See Remand Results at 1, 6. Commerce calculated an individual antidumping rate of 0.00 percent for Chengdu. See id. at 4. Commerce also assigned the separate rate respondents the average of Chengdu's 0.00 percent rate and Fengtai's AFA 82.05 percent rate, i.e., an all others separate rate of 41.025 percent. See id. at 7–8, 14–18.

In Bosun II, the court held Commerce's use of the expected method was not supported by substantial evidence because Commerce failed to address evidence proffered by respondents suggesting the expected method did not result in a rate reasonably reflective of respondents' dumping. See Bosun II, 44 CIT at __, 463 F. Supp. 3d at 1318–19. The court ordered Commerce to either reconsider or further explain its decision. See id. at 1319. Accordingly, Commerce reconsiders its decision

to assign a separate rate for non-examined respondents calculated on the basis of the expected method. See generally Second Remand Results. But ultimately, Commerce continues to rely on the expected method to calculate a separate rate for non-examined respondents, finding that the 41.025 percent rate is similar to the separate rate for non-examined respondents in the 2013-2014 review and is consistent with rates generally, which are trending upward. See id. at 8–9, 15. Bosun argues that Commerce failed to comply with the court's remand order to consider Bosun's prior rates, and to rely instead on a separate rate which Bosun contends was the result of one outlier rate calculated for a mandatory respondent. See Bosun's Br. at 1–2.

## JURISDICTION AND STANDARD OF REVIEW

The Court has jurisdiction pursuant to 516A(a)(2)(B)(iii) of the Tariff Act of 1930, as amended 19 U.S.C. § 1516a(a)(2)(B)(iii) (2012)[6] and 28 U.S.C. § 1581(c) (2012),[7] which grant the Court authority to review actions contesting the final determination in an administrative review of an antidumping duty order. This Court will uphold Commerce's determination unless it is "unsupported by substantial evidence on the record, or otherwise not in accordance with law[.]" 19 U.S.C. § 1516a(b)(1)(B)(i). "The results of a redetermination pursuant to court remand are also reviewed 'for compliance with the court's remand order.'" Xinjiamei Furniture (Zhangzhou) Co. v. United States, 38 CIT __, __, 968 F. Supp. 2d 1255, 1259 (2014)

---

[6] Further citations to the Tariff Act of 1930, as amended, are to the relevant provisions of Title 19 of the U.S. Code, 2012 edition.

[7] Further citations to Title 28 of the U.S. Code are to the 2012 edition.

Consol. Court No. 18-00102 Page 8

(quoting Nakornthai Strip Mill Public Co. v. United States, 32 CIT 1272, 1274, 587 F. Supp. 2d 1303, 1306 (2008)).

## DISCUSSION

Commerce defends its decision to use the expected method to calculate a rate for the separate rate respondents, including Bosun, by explaining that the resulting rate under the expected method, of 41.025 percent, is reflective of a general market trend of increasing rates, and is also comparable to the rate for non-examined separate rate respondents in the 2013-2014 review. See Second Remand Results at 8–9, 15. Bosun argues the results of the 2013-2014 review are the result of an outlier rate for one of the mandatory respondents in that review,[8] and argues that Commerce failed to comply with the court's remand order. See Bosun's Br. at 1–2.

Commerce is required to "determine the individual weighted average dumping margin for each known exporter and producer of the subject merchandise" unless "it is not practicable . . . because of the large number of exporters or producers involved in the investigation or review[.]" 19 U.S.C. § 1677f-1(c)(1)–(2). Where the exception

---

[8] Fengtai and Weihai Xiangguang Mechanical Industrial Co., Ltd. were the mandatory respondents in the 2013-2014 review. See [DSBs] From the [PRC], 81 Fed. Reg. 38,673, 38,674 (Dep't Commerce June 14, 2016) (final results of [ADD] admin. rev.; 2013-2014). Before review of Weihai was rescinded, it received a rate of 21.67 percent. See id. Fengtai received an individually calculated rate of 56.67 percent. See [DSBs] From the [PRC], 84 Fed. Reg. 23,763, 23,765 (Dep't Commerce May 23, 2019) (notice of ct. decision not in harmony with the final results of rev., rescission of admin. rev. in part, and amended final results of the [ADD] admin. rev.; 2013-2014). Commerce explains that "Bosun ignores that other issues remanded by the CIT increased the margin ultimately calculated based on Weihai's information." Second Remand Results at 18.

is met, Commerce may limit its examination to cover only certain exporters or producers of the subject merchandise. See id. at § 1677f-1(c)(2). Commerce normally calculates the rate applicable to non-investigated exporters and producers as the "weighted average of the estimated weighted average dumping margins established for exporters and producers individually investigated, excluding any zero and de minimis margins" and margins determined entirely on the basis of facts otherwise available. 19 U.S.C. § 1673d(c)(5)(A); see also Albemarle Corp. & Subsidiaries v. United States, 821 F.3d 1345, 1352–53 (Fed. Cir. 2016) ("Albemarle") (clarifying that the methods under 19 U.S.C. § 1673d apply to administrative reviews as well as investigations). However, where all margins for individually examined exporters and producers are zero, de minimis, or based entirely on facts otherwise available, Commerce "may use any reasonable method to establish the estimated all-others rate . . . , including averaging the estimated weighted average dumping margins determined for the exporters and producers individually investigated." Id. at § 1673d(c)(5)(B). The Statement of Administrative Action elaborates that the "expected method[,]" in this scenario, is "to weight-average the zero and de minimis margins and margins determined pursuant to the facts available, provided that volume data is available." Uruguay Round Agreements Act, Statement of Administrative Action, H.R. Doc. No. 103-316, vol. 1, at 873 (1994), reprinted in 1994

U.S.C.C.A.N. 4040, 4201.[9] If the "expected method" is "not feasible" or the method "results in an average that would not be reasonably reflective of potential dumping margins for non-investigated exporters or producers," Commerce may, instead, "use other reasonable methods." Id. Commerce's determination must be supported by substantial evidence. See Albemarle, 821 F.3d at 1352–53 (explaining that "Commerce must find based on substantial evidence that there is a reasonable basis for concluding that the separate respondents' dumping is different" to depart from the "expected method[.]").

Here, Commerce's application of the "expected method" of weight-averaging the zero and AFA margins is reasonable because, as Commerce explains on remand, it is feasible and produces a result that is reasonably reflective of the separate rate respondents' potential dumping. See Second Remand Results at 2, 6. Specifically, as instructed by the court Commerce considered the rates assigned to individually examined respondents over the preceding four reviews. Excluding rates based on AFA, Commerce calculated the following rates: in 2011-2012, 4.65 percent (Bosun) and 5.06 percent (Weihai Xiangguang Mechanical Industrial Co., Ltd. ("Weihai")); in

---

[9] The Statement of Administrative Action is "recognized by Congress as an authoritative expression concerning the interpretation and application of the Tariff Act under 19 U.S.C. § 3512(d)[.]" Yangzhou, 716 F.3d at 1373.

2012-2013, 3.45 percent (Bosun)[10] and 22.57 percent (Weihai); in 2013-2014,[11] 56.67 percent (Fengtai). See id. at 8.[12] Although the relatively lower rates calculated in 2011 and 2012 would suggest that the expected method would not lead to rates reasonably reflective of separate rate respondents' dumping, Commerce explains its position that the more contemporaneous rates reflect an upward trend, suggesting that the 41.025 percent rate is reasonably reflective of potential dumping by the separate rate respondents. See id. at 8–9, 15. The last calculated rate for non-individually examined respondents in 2013-2014, of 39.66 percent, is only slightly less than the rate sought to be imposed here. See id. at 15. This calculated rate for separate rate respondents resulted from the 56.67 percent rate calculated for Fengtai and the 21.67 percent rate calculated for Weihai, prior to the rescission of the review for Weihai.

---

[10] In its comments, Bosun states that it received a 1.51 percent rate in the 2012-2013 review. See Bosun's Br. at 3. Although this is the rate that it was assigned in the final results of the 2012-2013 review, see [DSBs] From the [PRC], 80 Fed. Reg. 32,344, 32,344 (Dep't Commerce June 8, 2015) (final results of [ADD] admin. rev.; 2012-2013), the final results were subsequently amended, and Bosun's rate was adjusted to 3.45 percent. See [DSBs] From the [PRC], 83 Fed. Reg. 55,520, 55,521 (Dep't Commerce Nov. 6, 2018) (notice of ct. decision not in harmony with the final results of rev. and amended final results of the [ADD] admin. rev.; 2012-2013)

[11] Bosun states that "Weihai, the other mandatory respondent in the 2013-14 appeal, had the review rescinded on appeal; prior to the rescission, however, the Department calculated a rate of 21.67%." Bosun's Br. at 2. In light of this fact, Bosun asserts that therefore "the 2013-14 review alone does not support the Department's conclusion that 41.025% is reasonably reflective." Id.

[12] In this review, 2014-2015, Fengtai received an AFA rate of 82.05 percent. See Second Remand Results at 8. In the subsequent review for 2015-2016, both Fengtai and Weihai received an AFA rate of 82.05 percent. See id.

Consol. Court No. 18-00102                                                                                          Page 12

In support of its argument that the 56.67 percent rate assigned to Fengtai in 2013-2014 is an "outlier," Bosun invokes a subsequent review in 2016-2017 where Fengtai received an even higher rate on the basis of AFA.  See Bosun's Br. at 2, 4.  That there is only an AFA rate in a subsequent review does not support Bosun's argument that Commerce was unreasonable in citing to Fengtai's rate in the 2013-2014 review.  Moreover, Bosun invoked rates from the 2017-2018 review, where the separate rate respondents, including Bosun, received a zero rate, seemingly to support its argument that Bosun deserves a zero rate here.  See Bosun's Br. at 4.[13]  However, the results of this subsequent review are not on the record of this case, compare Second Remand Results (published October 13, 2020), with [DSBs] From the PRC, 85 Fed. Reg. 71,308 (Dep't Commerce Nov. 9, 2020) (final results of [ADD] admin. rev.; 2017-2018) (published November 9, 2020), and even if they were Commerce addresses Bosun's contention that it should be assigned a zero rate.[14]  Commerce finds no support for assigning Bosun a zero rate in this review because, unlike Chengdu which received a zero rate because it was found to not have sold the subject merchandise at less than normal value, Bosun when individually examined

---

[13] As noted by Defendant-Intervenor, Diamond Sawblades Manufacturers' Coalition, the results of the 2017-2018 review are still subject to appeal.  See [Def.-Intervenor] Diamond Sawblades Manufacturers' Coalition's Reply Cmts. on Results of Second Remand Redetermination at 3, Dec. 14, 2020, ECF No. 99.

[14] Bosun claims that under the circumstances, Chengdu's 0.00 percent rate is the "only appropriate margin" to assign to Bosun.  Bosun's Br. at 5–6.

in the past, was found to have sold at less than normal value. See Second Remand Results at 13–14.

Bosun nonetheless argues that Commerce's imposition of the 41.025 percent rate upon Bosun is unfair because it is based in part on a total AFA rate and Bosun is a cooperating exporter. See Bosun's Br. at 4–5. Bosun relies on Changzhou Hawd Flooring Co. v. United States, 848 F.3d 1006 (Fed. Cir. 2017) ("Changzhou Hawd") as support for its position that Commerce acted unfairly. See Bosun's Br. at 4–5. Bosun's reliance is misplaced. In Changzhou Hawd, all of the individually examined respondents received either a zero or de minimis rate. See Changzhou Hawd, 848 F.3d at 1008. In calculating the all others separate rate, Commerce departed from the expected method, which would have resulted in a de minimis rate for the separate rate respondents and calculated a rate that incorporated the PRC-wide rate for parties that had not rebutted the presumption of government control. See id. at 1008–09, 1011. The Court of Appeals held that this departure was unreasonable absent an explanation by Commerce as to why the individually examined respondents' rates were not representative of the separate rate respondents potential dumping. See id. at 1011–13. Changzhou Hawd thus differs from the present case. Although Bosun attempts to marshal the implication in Changzhou Hawd, that a separate rate respondent should not be saddled with a rate attributable to a non-cooperating party, see Bosun's Br. at 4–5, Commerce here is not deviating from the expected method, as it did in Changzhou Hawd. Rather, here Commerce assigns the

separate rate respondents a rate derived by the expected method; an average of an AFA rate and a zero rate. Commerce then explains why that rate is reasonably reflective of separate rate respondents' potential dumping. Commerce bases its explanation on record evidence of recent past calculated rates, and Commerce considers and addresses the record evidence that detracts from its determination. Commerce's explanation is reasonable.

## CONCLUSION

For the foregoing reasons, Commerce's <u>Second Remand Results</u> are supported by substantial evidence and comply with the court's order in <u>Bosun II</u>, and are therefore sustained. Judgment will enter accordingly.

<u>/s/ Claire R. Kelly</u><br>
Claire R. Kelly, Judge

Dated: February 24, 2021
         New York, New York